**ORAL ARGUMENT NOT YET SCHEDULED**

---

**Case No. 09-1233**

---

**IN THE UNITED STATES COURT OF APPEALS FOR
THE DISTRICT OF COLUMBIA CIRCUIT**

---

**THE CITY OF SANTA MONICA,**

**Petitioners**

**v.**

**FEDERAL AVIATION ADMINISTRATION,**

**Respondent**

---

**REVIEW OF A FINAL AGENCY DECISION AND ORDER
ISSUED BY THE FEDERAL AVIATION ADMINISTRATION**

---

**BRIEF OF AMICI CURIAE
AIRCRAFT OWNERS AND PILOTS ASSOCIATION
AND
NATIONAL BUSINESS AVIATION ASSOCIATION, INC.
IN SUPPORT OF RESPONDENT AND AFFIRMANCE**

---

Kathleen A. Yodice, Esq.
Elizabeth M. Candelario, Esq.
Law Offices of Yodice Associates
601 Pennsylvania Avenue, N.W.
Suite 875, South Building
Washington, DC 20004
(202) 737-3030
*Counsel for Amicus Aircraft Owners and
Pilots Association*

Frank J. Costello, Esq.
Jol A. Silversmith, Esq.
Zuckert, Scoutt & Rasenberger, LLP
888 Seventeenth Street, N.W.
Suite 700
Washington, DC 20006
(202) 298-8660
*Counsel for Amicus National Business
Aviation Association, Inc.*

June 28, 2010

## <u>Certificate as to Parties, Rulings, and Related Cases</u>

**A.    Parties and Amici**

The parties involved in the proceeding below, before the Federal Aviation Administration ("FAA"), included the City of Santa Monica ("City") and FAA's Office of Airport Safety, with the following parties admitted to participate: California Department of Transportation; Airports Council International – North America; Mr. Martin Rubin, Director, Concerned Residents Against Airport Pollution; Mr. Rob Kadota, Director, Mar Vista Community Council; Ms. Jacqueline A. Magnum, Esq., Magnum Law Offices; Ms. Zina Josephs, President, Friends of Sunset Park; and Ms. Susan J. Hartley, Esq., Law Offices.  Before this Court, the City of Santa Monica is the Petitioner and the Federal Aviation Administration is the Respondent.  The Aircraft Owners and Pilots Association ("AOPA") and the National Business Aviation Association, Inc. ("NBAA") are *amici curiae* ("Amici").  To Amici's knowledge, there are no intervenors in this case.

**B.    Rulings Under Review**

This case is based on a petition filed by the City for review of an FAA Order, <u>In the Matter of the City of Santa Monica</u>, Final Agency Decision and Order, FAA Order No. 2009-1 (FAA Docket No. 16-02-08; FDMS No. FAA-2003-15807, July 8, 2009) *modified by* <u>In the Matter of the City of Santa Monica,</u>

i

Decision and Order, FAA Order No. 2009-2 (Sept. 3, 2009), affirming in part and reversing in part the decision of an FAA Hearing Officer.

## C.    Related Cases

This case was not previously before this Court or any other court of competent jurisdiction.  To Amici's knowledge, there are no related cases pending before this Court.  However, there was prior litigation between the City and FAA regarding the enforceability of an Interim Cease and Desist Order issued by FAA, which was concluded by an unpublished decision that upheld FAA's order, 330 Fed. Appx. 124 (May 8, 2009), in <u>U.S. v. City of Santa Monica</u> (9th Cir. Docket No. 08-55869).

## **Table of Contents**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............. i

TABLE OF CONTENTS .............. iii

TABLE OF AUTHORITIES .............. iv

GLOSSARY .............. viii

CORPORATE DISCLOSURE STATEMENT .............. x

STATUTES AND REGULATIONS .............. xii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY .............. 1

SUMMARY OF ARGUMENT .............. 2

ARGUMENT .............. 3

INTRODUCTION .............. 3

I.      Airport Proprietors Cannot Avoid the Assurances Made in Accepting
        Federal Funds Simply by Claiming Restrictions Will Enhance Safety .............. 7

II.     Congress Intended There to Be a Uniform and Exclusive System of Federal
        Regulation Over Aviation Safety .............. 13

III.    Even If Municipalities Have Any Authority Over Aviation Safety, Santa
        Monica's Purported Safety Rationale Is Belied by its Actual Conduct; the
        City's Long-Standing Agenda Is to Restrict Access at SMO .............. 22

CONCLUSION .............. 27

CERTIFICATE OF COMPLIANCE .............. xiii

CERTIFICATE OF SERVICE .............. xiv

ADDENDUM

## Table of Authorities

## Cases

A.B.F. Freight System, Inc. v. Suthard, 681 F.Supp. 334 (E.D.Va. 1988) .................5

AFL-CIO v. Am. Petroleum Inst., 448 U.S. 607 (1980) .................25

Air Line Pilots Association, International v. Queseda, 276 F.2d 892 (2d Cir. 1960) .................18

Air Transp. Association of America v. Cuomo, 520 F.3d 218 (2d Cir. 2008) ...17, 18

*Arapahoe County Pub. Airport Auth. v. FAA, 242 F.3d 1213 (10th Cir. 2001) ...11

Aux Sable Liquid Products v. Murphy, 526 F.3d 1028 (7th Cir. 2008) .................4

Banner Advertising, Inc. v. City of Boulder, 868 P.2d 1077 (Colo. 1994) .................19

Bethman v. City of Ukiah, 265 Cal. Rptr. 539 (Cal. App. 1989) .................19

Big Stone Broadcasting, Inc. v. Lindbloom, 161 F.Supp.2d 1009 (D.S.D. 2001) ...19

Burbank-Glendale-Pasadena Airport Authority v. City of Los Angeles, 979 F.2d 1338 (9th Cir. 1992) .................18

Cablevision Systems Corp. v. FCC, 597 F.3d 1306 (D.C. Cir. 2010) .................21

*City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624 (1973) .....3, 14, 15

CSX Transportation, Inc. v. Williams, 406 F.3d 667 (D.C. Cir. 2005) .................3, 4

Far East Conference v. U.S., 342 U.S. 570 (1952) .................21

Hines v. Davidowitz, 312 U.S. 52 (1941) .................15

Hoagland v. Town of Clear Lake, 415 F.3d 693 (7th Cir. 2005) .................13

Menard v. FAA, 548 F.3d 353 (5th Cir. 2008) .................19

Montalvo v. Spirit Airlines, 508 F.3d 464 (9th Cir. 2007) .................15

Northwest Airlines, Inc. v. County of Kent, 510 U.S. 355 (1994) .................... 21

NRDC, Inc. v. EPA, 824 F.2d 1146 (D.C. Cir. 1987) ................................ 24

Rowe v. N.H. Motor Transp. Association, 442 U.S. 364 (2008) .................. 17

Sandell v. FAA, 923 F.2d 661 (9th Cir. 1990) .................................... 19

Santa Monica Airport Association v. Santa Monica, 481 F. Supp. 927 (C.D. Cal. 1979), *affirmed* 659 F.2d 100 (9th Cir. 1981) .................................. 5

U.S. v. Locke, 529 U.S. 89 (2000) ................................................ 4

U.S. v. City of Santa Monica, 330 Fed. Appx. 124 (9th Cir. May 8, 2009) .......... ii

Witty v. Delta Airlines, 366 F.3d 380 (5th Cir. 2004) .......................... 16, 18

**Statutes**

26 U.S.C. § 9502 ............................................................... 1

33 U.S.C. § 1221, et. seq. ..................................................... 4

49 U.S.C. § 40103 ........................................................... 1, 15

49 U.S.C. § 41713 .......................................................... 15, 17

49 U.S.C. § 47101 ............................................................. 1

49 U.S.C. § 47101, et seq. .................................................... 23

49 U.S.C. § 47103 ......................................................... 1, 7, 8

49 U.S.C. § 47104 ............................................................. 9

*49 U.S.C. § 47107 ........................................................... 8

49 U.S.C. § 47521, et seq. .................................................... 20

Surface Transportation Assistance Act of 1982 (96 Stat. 2097) ............... 4, 5

Surplus Property Act of 1944 (ch. 479, 58 Stat. 765) ......................... 23

## **Regulations**

14 C.F.R. Part 16 .......................................................................................... 7, 9, 15

14 C.F.R. § 91.1025 ............................................................................................. 16

14 C.F.R. § 135.23 ............................................................................................... 16

14 C.F.R. § 139.392 ............................................................................................. 18

14 C.F.R. Part 161 ............................................................................................... 26

## **Rules**

Circuit Rule 26.1 .................................................................................................... x

Circuit Rule 32 .................................................................................................... xiii

Federal Rule 29 .............................................................................................. x, xiii

Agency Materials

Airport Compliance Manual, FAA Order 5190.6B (Sept. 30, 2009) ......... 9, 10, 11

Airport Improvement Program Handbook, FAA Order 5100.38C (June 28, 2005)
............................................................................................................ 8, 23

AOPA v. City of Pompano Beach, Director's Determination (FAA Docket No. 16-
04-01, December 15, 2005) ................................................................... 15

Bombardier Aerospace Corp. and Dassault Falcon Jet Corp. v. City of Santa
Monica, Director's Determination (FAA Docket No. 16-03-11, January 3,
2005) ....................................................................................................... 6

Federal Aviation Administration Report to Congress: National Plan of Integrated
Airport Systems 2009-2013 .................................................................... 8

Final Decision on Proposed Airport Access Restriction (FDMS Docket No. FAA-
2009-0546, October 31, 2009) .............................................................. 26

Final Decision on Proposed Airport Access Restriction, 74 Fed. Reg. 66397 (Dec.
15, 2009) ............................................................................................... 26

<u>In the matter of compliance with federal obligations by the Naples Airport Authority</u>, Final Agency Decision and Order (FAA Docket No. 16-01-05, August 25, 2003), *vacated and remanded on other grounds*, 409 F.3d 431 (D.C. Cir. 2005)..................................................................................15

<u>United Aerial Advertising, Inc. v. County of Suffolk Board of Commissioners</u>, Director's Determination (FAA Docket No. 16-99-18, May 18, 2000)........10

<u>Legislative Materials</u>

H.R. Rep. No. 2360 (85th Cong. 2d Sess. 1), reprinted in 1958 U.S.C.C.A.N. 3741 ................................................................................................................14

* Authorities upon which we chiefly rely are marked with asterisks.

# Glossary

Airport        Santa Monica Municipal Airport

AIP            Airport Improvement Program

AOPA           Aircraft Owners and Pilots Association

ARC            Airport Reference Code

City           City of Santa Monica

DD             Director's Determination

DHS            Department of Homeland Security

DOT            Department of Transportation

EMAS           Engineered Material Arresting System

FAA            Federal Aviation Administration

FAA Br.        Brief of Respondent Federal Aviation Administration

FAD            Final Agency Decision and Order

IDHO           Initial Decision of the Hearing Officer

J.A.           Joint Appendix

LAX            Los Angeles International Airport

NBAA           National Business Aviation Association, Inc.

NPIAS          National Plan of Integrated Airport Systems

Pet. Br.       Brief of Petitioner City of Santa Monica

RPZ            Runway Protection Zone

RSA         Runway Safety Area

SMO         Santa Monica Municipal Airport

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 29(c) and Circuit Rule 26.1, AOPA and NBAA state as follows:

### Aircraft Owners and Pilots Association

AOPA is an independent, not-for-profit, education and advocacy association incorporated under the laws of New Jersey and headquartered in Frederick, Maryland.  AOPA represents the interests of more than 415,000 pilots who operate general aviation aircraft (*i.e.*, aircraft other than those operated by the airlines and the military).  A primary purpose of AOPA is to promote, protect, and represent the interests of its members.  AOPA does not have any parent corporation.  As a non-profit association, AOPA does not have any stock and therefore no corporation owns any AOPA stock.

### National Business Aviation Association, Inc.

NBAA is an independent, not-for-profit, education and advocacy association incorporated under the laws of and headquartered in Washington, DC.  NBAA represents the interests of more than 8,000 companies that operate general aviation aircraft as an aid to the conduct of their business or that are otherwise involved in business aviation.  A primary purpose of NBAA is to promote, protect, and represent the interests of its members.  NBAA does not have any parent

corporation.   As a non-profit association, NBAA does not have any stock and therefore no corporation owns any NBAA stock.

## **Statutes and Regulations**

Pertinent statutes are set forth in the Addendum bound with this brief.

## Statement of Identity, Interest, and Authority

*Amici Curiae* AOPA and NBAA are trade associations that represent the interests of persons and companies that operate aircraft.  AOPA represents more than 415,000 pilots in the United States.  NBAA represents more than 8,000 companies that operate aircraft in the conduct of their business or are otherwise involved in business aviation.  The members of both associations operate general aviation aircraft, *i.e.*, aircraft other than those operated by the airlines or by the military.  As such, they account for approximately two-thirds of the aircraft hours flown in the national airspace system.

As airport users, AOPA's and NBAA's members share an interest in preserving access to the nation's public-use airports, particularly those, like Santa Monica Municipal Airport ("SMO"), that have received Federal financial support through the Aviation Trust Fund.  The Aviation Trust Fund is financed by the taxes and fees paid by *users* of the aviation system, not by general revenue.  See 26 U.S.C. § 9502.  AOPA and NBAA are also interested in preserving the Federal government's role, policies, and law in maintaining and developing a safe, efficient and integrated national transportation infrastructure that is, in part, dependent on reasonable access to public-use and reliever airports such as SMO.  See 49 U.S.C. §§ 40103, 47101, and 47103.

1

This case involves issues that could undermine the legitimate and clear intent of those policies and laws that work to further the interests of the citizens of the United States in a uniform national airspace that is not beleaguered by a patchwork of unnecessary airport rules. There is more at stake in this case than a limited number of flights per day at SMO. A decision in this case could affect the Federal government's ability to continue to provide a national air transportation system. AOPA and NBAA accordingly seek to assist the Court by addressing the underlying issues for and broader ramifications of any disposition the Court may make in this case, so that the Court may be fully informed and that any decision in this case would not have unintended adverse consequences on future matters.

AOPA and NBAA have authority to participate as *amici curiae* and to file this joint brief pursuant to orders by the Court dated November 23, 2009 and December 7, 2009.

## <u>Summary of Argument</u>

FAA's holding that the City of Santa Monica's ordinance violated Federal Grant Assurances was both within its statutory authority and amply supported by the record, and not subject to any exemption based on Santa Monica's role as an airport proprietor. To allow safety restrictions to be determined on a piecemeal basis would disrupt the uniform and exclusive Federal regulation of aviation safety that was intended by Congress and is necessary to ensure the safety and efficiency

of the *national* aviation system.   Accordingly, the petition for review should be denied.

## Argument

### Introduction

The United States today has a national transportation system because the Federal government has spent substantial taxpayer monies and set uniform standards to assure that it is safe and accessible to all users, without discrimination. SMO is a significant facility within that system; it is a "reliever" airport for Los Angeles International Airport ("LAX"), and handles more than 100,000 operations per year.  See FAA Br., at 6.  Accordingly, the City's proposal to restrict access would have real and significant effects, including on AOPA and NBAA members that are based at the airport and that use SMO on a transient basis.  Moreover, Santa Monica is seeking to set a precedent that could be emulated by other airports across the nation to restrict access to or even entirely shut down airports, in the service of parochial interests.   As the D.C. Circuit observed in a decision invalidating local restrictions on another mode of transport, CSX Transportation, Inc. v. Williams, 406 F.3d 667 (D.C. Cir. 2005), "[i]t would not take many similar bans to wreak havoc with the national system."   Id. at 673.   See also City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 639 (1973) ("it is obvious that fractionalized control ... would severely limit the flexibility of FAA").

What Santa Monica ultimately asserts to this Court is that it (and, by extension, any other locality) has a unilateral right to impose discriminatory standards on the operation of aircraft that would have the practical effect of dismembering the air transportation elements of the system. That should not and cannot be the law. For example, if the City attempted to impose weight limitations on the Santa Monica Freeway – an interstate highway (I-10) – such action obviously would be unlawful. See Aux Sable Liquid Products v. Murphy, 526 F.3d 1028, 1035 (7th Cir. 2008) ("[i]f states were truly left to define this term [reasonable access] on their own, the express preemption language [in the Surface Transportation Assistance Act of 1982] would be rendered effectively meaningless, since states would be able to define 'reasonable access' so as to allow states and local authorities to severely impede commercial motor carriers' access to the Interstate"). Likewise, if the City attempted to limit the types of commodities that could be carried on interstate rail lines running through Santa Monica, such action obviously would be unlawful. See Williams, 406 F.3d at 672 (granting preliminary injunction; "[n]either the court nor the District is authorized or equipped to measure off the adequacy of either [DOT or DHS]'s strategic determinations").[1]

---

[1] The Port and Waterways Safety Act of 1972 (33 U.S.C. § 1221, et seq.) similarly preempts local regulation of water transportation. See U.S. v. Locke, 529 U.S. 89

*(continued…)*

It is equally obvious that a unilateral weight restriction imposed on the use of the airport is unlawful.  There are substantial Federal grants invested at SMO, which were awarded based on the commitment of the City to comport with numerous assurances, including non-discriminatory access for all users.  <u>See</u> FAA Br., at 6.  Yet the City has proposed to close the airport to Category C and D aircraft, which comprise approximately 7% of its operations, based on alleged safety considerations that have no demonstrable basis in fact and inconsistent with the findings of FAA, the agency that has both the exclusive authority and the substantial experience to make such determinations for air transportation.

Moreover, although Santa Monica has framed the issue before the Court as being one of safety, the City has long-standing animosity to the airport, and a track record of efforts to restrict operations at SMO and to close the airport altogether. [2]

---

(2000).  <u>See also</u> <u>A.B.F. Freight System, Inc. v. Suthard</u>, 681 F.Supp. 334, 341 (E.D.Va. 1988) (the Surface Transportation Assistance Act of 1982 requires that, if allowed at all, local restrictions "be based solely on valid considerations of *safety* and not on any other, extraneous factors") (emphasis in original).

[2] For example:

- In the late 1970s, the City proposed extreme landing and departure fees for jet operations at the airport.  The proposal was struck down.  <u>See</u> <u>Santa Monica Airport Association v. Santa Monica</u>, 481 F. Supp. 927, 945 (C.D. Cal. 1979), *affirmed* 659 F.2d 100 (9th Cir. 1981).  <u>See also</u> FAA Br., at 7.

- In 1981, the City proposed to close the airport.  The ensuing litigation resulted in the 1984 Settlement Agreement that recognized the binding nature of the *(continued…)*

Thus, even assuming, *arguendo*, that the City could enact a safety-based ordinance without FAA acquiescence, this tribunal might yet consider whether the City's motivation in the current matter is actually to ensure the *safety* of operations at SMO – especially since the City has consistently rejected or refused to consider alternative safety enhancements – or whether the City's intent, slow and steady, is that there are ultimately *no* operations at SMO.

FAA's conclusion that Santa Monica's ordinance banning Category C and D aircraft is unjustified was both within its statutory authority and amply supported by the record. The City's attempts at banning such aircraft on the basis of safety,

---

grant assurances and under which the City agreed to "operate and maintain the Airport as a viable functioning facility without derogation of its role as a general aviation reliever … until July 1, 2015." Id., §§ 2.a.i. and § 8 (J.A. 170, 177). See also FAA Br., at 7-8.

- In 2002, the City tried to bar any aircraft larger or faster than aircraft meeting FAA's Airport Reference Code ("ARC") B-II standard. The City further proposed to create a Runway Safety Area ("RSA") by displacing the landing thresholds 300 feet at either end of the runway. See FAD, at 18-19 (J.A. 1096-97). FAA shortly thereafter issued a Notice of Investigation (FAA Docket No. 16-02-08) (J.A. 1).

- In 2003, the City proposed a new fee schedule that imposed higher fees per landed weight as the size of aircraft increased. NBAA and other parties filed a complaint pursuant to 14 C.F.R. Part 16, and on January 3, 2005, FAA issued a Director's Determination finding the proposed fees to be inconsistent with the airport's Federal obligations (FAA Docket no. 16-03-11).

The ordinance that the City adopted in 2008 is essentially a revival of the 2002 ARC-based proposal. See FAA Br., at 10.

contrary to the FAA's determination, is outside the realm of the City's general police power or its authority as an airport proprietor. To allow safety restrictions to be determined on a piecemeal basis will be to disrupt the system of uniform and exclusive Federal regulation that is required and was intended by Congress to ensure the safety and efficiency of the *national* aviation system. Accordingly, the petition for review should be denied.

## I.     Airport Proprietors Cannot Avoid the Assurances Made in Accepting Federal Funds Simply by Claiming Restrictions Will Enhance Safety

AIP is an essential tool with which the Secretary of Transportation maintains "the national plan of integrated airport systems" (NPIAS). See 49 U.S.C. § 47103(a). AIP serves as a vehicle for the distribution of funds from the Aviation Trust Fund to airport operators in order to develop critical infrastructure. The Grant Assurances, which are conditions of accepting those funds, are in turn essential to ensure that the Federal investment will truly serve the public interest and that all users will have access to the system they helped to finance. AIP grants are awarded to airports because of their importance to the *national* system, and airports in receipt of these grants must be mindful that the funds are drawn from users of the entire system.

AIP is a voluntary program, which imposes demands only on those airport operators who choose to accept Federal grants. An airport sponsor receiving AIP funds is required to sign an agreement obligating the sponsor to standard terms and

conditions, including published Grant Assurances.   One of those obligations mandates that the airport be available on reasonable conditions and without unjust discrimination.   See 49 U.S.C. § 47107(a)(1); Grant Assurance 22(a).   Ensuring adherence and compliance with this obligation is the responsibility of the sponsor signing the agreement.   Given the central role that this Grant Assurance plays in the scheme of maintaining a publicly available national airport network, it is vital that it be enforced vigorously and independently.

SMO is listed in the NPIAS among the 3,356 airports that are identified by FAA as being integral to the national air transportation system that falls within its regulatory oversight.   See 49 U.S.C. § 47103; FAA Report to Congress: National Plan of Integrated Airport Systems 2009-2013.   In this capacity, SMO is eligible to participate in the AIP, and since 1985, SMO has accepted approximately $10.2 million in Federal grants for airport development assistance.   See FAA Br., at 6.   In exchange for its acceptance of Federal funds, the airport signed contracts with FAA, obligating itself to the statutorily-required Grant Assurances, including the obligation to make the airport available on reasonable and not unjustly discriminatory terms.   See id., at 5, 6; FAD at 34 (J.A. 1112).

FAA is charged with making sure that the money Congress allocates from the Aviation Trust Fund to the AIP each year is spent for the purposes Congress identified.   See Airport Improvement Program Handbook, FAA Order 5100.38C,

chap. 2, § 2 (June 28, 2005); 49 U.S.C. § 47104.    FAA has been given

responsibility for interpreting and applying the statutory assurances to specific

facts and circumstances.    See FAA Order 5190.6B, ¶ 1.1 (Sept. 30, 2009);

14 C.F.R. Part 16.   It is essential to the fair and efficient functioning of the AIP

program that the Grant Assurances be given consistent meaning by FAA.    The

determination of compliance with Grant Assurances is entrusted to FAA, and

judged according to uniform, Federally-adopted standards.    This ensures that the

purpose of the AIP – the maintenance of a "national plan of integrated airport

systems" – will be achieved.    The City of Santa Monica, in contrast, would justify

its access restriction on the basis of purely local and speculative considerations.

See Pet. Br. at 33-35.

    The City here proposes to ban certain aircraft on the basis of safety under the

exception contained in Grant Assurance 22(i), which allows an airport sponsor to

"prohibit or limit any given type, kind or class of aeronautical use of the airport if

such action is necessary for the safe operation of the airport or necessary to serve

the civil aviation needs of the public."[3]    See FAA Br., at 24.    FAA's Airport

---

[3] Santa Monica curiously argues that FAA analyzed its ordinance only through the
lens of an exemption to 22(i), and not the principle language of Grant Assurance
22(a).  See FAA Br. at 33, n.8. But it is clear that when FAA referred to 22(i) in
the proceedings below, it did so because the ordinance, *in addition* to not meeting
the general standards of 22(a), *also* did not qualify for the 22(i) exemption.  See
FAD, at 25, 34 (J.A. 1103, 1112); FAA Br., at 24-25.  Indeed, the FAD repeatedly
*(continued…)*

9

Compliance Manual makes clear, however, that: "*FAA, not the sponsor, is the authority to approve or disapprove aeronautical restrictions based on safety and/or efficiency at federally obligated airports.*" FAA Order 5190.6B, ¶ 14.3 (emphasis in original). See also United Aerial Advertising, Inc. v. County of Suffolk Board of Commissioners, Director's Determination, at 9 (FAA Docket No. 16-99-18, May 18, 2000); FAA Br., at 27-28.

As discussed above, such authority necessarily rests with FAA because, as recognized by Congress, FAA is in the best position to evaluate safety and efficiency with consideration of the entire NPIAS and in relation to particular airports. As explained by FAA in its Airport Compliance Manual, the relevant inquiry is: "whether or not the restricted activity can be safely accommodated on less restrictive terms than the terms proposed by the airport sponsor without adversely affecting the efficiency and utility of the airport." Id., ¶ 14.3. Simply because the City asserts that there is an even safer way to regulate use of the airport does not justify imposition of a more restrictive regulation.

The City argues that although aircraft *can* land safely at SMO, there is no guarantee that they *will* and therefore, the City should be able to impose additional restrictions. See Pet. Br. at 42. Under this logic, any airport proprietor could avoid

_____

establishes that the ordinance was not reasonable and unjustified as a general proposition. See id. at 35, 37-38, 39-40, 46 (J.A. 1113, 1115-16, 1117-18, 1124).

its obligations under the Grant Assurances simply by asserting that its restrictions would make the airport safer. There is no authority for finding such power on the part of local proprietors, and in fact it has been expressly rejected. <u>See</u> <u>Arapahoe County Pub. Airport Auth. v. FAA</u>, 242 F.3d 1213, 1222-23 (10th Cir. 2001) (rejecting proprietor's "apparent assertion that so long as they declare their regulatory action necessary for safety or to satisfy aviation needs, they enjoy carte blanche power," in noting the Courts' recognition of the "extremely limited role" of local proprietors).[4]

Moreover, the City ignores key language in the section of the Grant Assurance at issue, 22(i), which provides a limited exception to the inability to restrict use if it is *necessary* for safety. In order for a proprietor to restrict use of an airport that received Federal funds, the restriction must be "adequately justified and supported." FAA Order 5190.6B, ¶ 14-3. To ensure national continuity in interpretation of the Grant Assurances and to further the purpose of the grant funds, "FAA is the final arbiter regarding aviation safety and will make the

---

[4] Indeed, there is no limiting principle to the authority asserted by the City of Santa Monica. Although the ordinance provides an exemption that allows Category C and D aircraft to utilize SMO in an emergency, <u>see</u> FAA Br. at 15, by the City's reasoning it also could prohibit emergency operations – *i.e.*, if *ordinary* operations pose safety risks that justify a ban, then an aircraft experiencing an *emergency* would pose an even greater risk, and should be diverted towards a neighboring community, to safeguard the City's own insular interests.

determination regarding the reasonableness of the sponsor's proposed measures that restrict, limit, or deny access to the airport." Id.

It is not enough to assert that the restriction will provide safety benefits, or that without the restriction the airport does not conform to design standards for new airports. See Pet. Br. at 39, 45. Such a position ignores the myriad of other considerations taken into account and balanced by FAA in making a safety determination as to whether a restriction is necessary at a particular airport. The City would argue that because FAA encourages and in some cases requires the use of RSAs off the end of runways, the lack of RSAs is a justification for restricting certain aircraft from landing at SMO. See Pet. Br. at 42. But simply because an airport cannot meet ideal safety enhancements and the design standards for new airports does not mean it is unsafe. Such reasoning would be akin to a municipality prohibiting older trucks from driving on its roads as environmental hazards because they did not meet the emissions standards for new vehicles.

There are always new safety improvements being made, and AOPA and NBAA fully support advancements in the safety of airports, including narrowly-tailored bans in the rare event that FAA finds no less restrictive means of accomplishing the goal of safety. Amici also realize that certain issues are best addressed by local control, and submit that FAA is aware of the necessary boundaries of local control. See Hoagland v. Town of Clear Lake, 415 F.3d 693,

12

698-99 (7th Cir. 2005) (FAA determination recognized that local land use, *i.e.* zoning rules, must be complied with in limiting a determination to consideration of "the safe and efficient use of airspace by aircraft and with respect to the safety of persons and property on the ground").  But is imperative for national continuity of the entire aviation network, as well as ensuring that all safety and efficiency concerns are balanced, that FAA be the sole arbiter of mainstay safety issues in the proper exercise of its Congressionally-mandated authority.

## II.   Congress Intended There to Be a Uniform and Exclusive System of Federal Regulation Over Aviation Safety

Congressional actions over the entire history of commercial aviation point to one goal: a unified *national* system.   There is more at stake here than "approximately 7% of total operations" at SMO.   See Pet. Br. at 4.[5]   The underlying question is whether we will continue to have a *national* air transportation system, or, on the other hand, a system that is subject to a

---

[5] Santa Monica asserts that the effect of the restriction would be "modest" because only 7% of operations would be affected (see Pet. Br., at 57).  But the effect would be anything but modest for the thousands of annual operations which would be 100% banned and forced elsewhere.   Moreover, the City asserts that flights operated by fractional ownership entities "could exercise the option of using readily-available Category A or B aircraft to fly into SMO."   See id.  But the portion of the record cited by the City (the self-serving testimony of its Airport Director) does not support the proposition that such aircraft are appropriate for the needs of fractional customers, nor does it establish that Category A and B aircraft are "readily-available" from fractional ownership entities.

"patchwork quilt" of local restraints and impediments to aircraft operations. As recognized by the Supreme Court, the Federal Aviation Act:

> requires a delicate balance between safety and efficiency, and the protection of persons on the ground. ... The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled.

City of Burbank, 411 U.S. at 638-39 (citations omitted). FAA has been tasked by Congress with developing plans and policy to carry out these objectives of safety and efficiency. See H.R. Rep. No. 2360 (85th Cong, 2d Sess. 1), *reprinted in* 1958 U.S.C.C.A.N. 3741, 3741 ("the administrator of the new Federal Aviation Agency (1) would be given full responsibility and authority for the ... promulgation and enforcement of safety regulations..."). To ensure the realization of these objectives, Congress intended that FAA be the sole source of such regulations. See id. at 3761 (letter from Executive Branch representative noting that "[i]t is essential that one agency of government, and one agency alone, be responsible for issuing safety regulations if we are to have timely and effective guidelines for safety in aviation"). Local regulation of safety therefore "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and accordingly is preempted. See Hines v. Davidowitz, 312 U.S. 52, 67 (1941).[6]

---

[6] AOPA and NBAA concur with FAA that this Court need not reach the issue of whether Federal preemption was *directly* cognizable within the administrative *(continued…)*

Yet in this case, the City asserts that it stands in a position better than FAA to regulate access to a portion of the national air transportation system on the basis of safety. In doing so, the City fails to recognize the wider implications of its ordinance and focuses solely on local and speculative concerns. This is exactly the type of tunnel vision meant to be avoided in assigning sole responsibility for safety regulation to FAA. FAA, as intended by Congress and recognized by Courts, weighs the efficient use of airspace nationwide *and* with respect to the safety of persons and property on the ground. See 49 U.S.C. § 40103(b)(2); City of Burbank, 411 U.S. at 624; Montalvo v. Spirit Airlines, 508 F.3d 464, 471 (9th Cir. 2007); Witty v. Delta Airlines, 366 F.3d 380, 385 (5th Cir. 2004). Such analysis is necessary to ensure the efficiency not only of the particular airport, but as it stands in relation to the entire system.

---

proceeding below because this case appears to be controlled by the Grant Assurances. See FAA Br., at 22-23, n.6. But we further observe that Santa Monica's argument against preemption being considered pursuant to 14 C.F.R. Part 16 is based on a single administrative decision, issued pursuant to a different set of regulations. See Pet. Br. at 16-17. In fact, two later Part 16 decisions have indicated that preemption is cognizable. See In the matter of compliance with federal obligations by the Naples Airport Authority, Final Agency Decision, at 4 n.7 (FAA Docket No. 16-01-05, August 25, 2003) (agency did not reach preemption in affirming Director's Determination, but did not indicate that there had been any error in considering it), *vacated and remanded on other grounds*, 409 F.3d 431 (D.C. Cir. 2005); AOPA v. City of Pompano Beach, Director's Determination, at 14 (FAA Docket No. 16-04-01, December 15, 2005) (considering preemption pursuant to 49 U.S.C. § 41713 in proceeding involving air carriers).

Airport proprietors, including the City of Santa Monica, do not and cannot completely and effectively evaluate the overall safety of such use balanced with the efficiency of the national aviation system as a whole. Such inability is demonstrated by this very case. The City has adopted an across-the-board ban of certain classes of aircraft. The City's limitation looks solely to an aircraft's landing speed at maximum landing weight. FAA, however, has always based its determinations of an aircraft's ability to land safely on analysis of multiple factors, including its design features and characteristics, and the physical and atmospheric conditions at the particular airport. See FAA Br. at 17; R.61 at 11; 14 C.F.R. § 135.23; 14 C.F.R. § 91.1025. Approach speed is only one of many relevant factors, and cannot be considered in a vacuum. See FAA Br. at 18. The City also ignores, as the FAA does not, the relative differences between the types of aircraft within the various classes, *i.e.* propeller-driven piston-powered aircraft, which the City does not seek to prohibit, versus jets, which the City is attempting to ban despite their better safety record and lack of involvement in any of the 23 accidents at SMO over the past 21 years. See FAA Br. at 29-30; FAD at 39-40; R.61, at 12.

The City's inability – or perhaps unwillingness – to consider all relevant safety concerns is further illustrated by its disregard of the overall excellent safety record of aircraft in Classes C and D, focusing instead solely on the miniscule possibility of an overrun. See FAA Br. at 30. Likewise, the City's lack of

16

comprehensive understanding of the necessity for safety measures is evidenced by its confusion of Airport Reference Codes with Aircraft Approach Categories; ARCs are a means to identify development needs that are used for decisions concerning Federal funding, not for safety standards. See Pet. Br. at 44-46; FAA Br. at 21-22; FAD at 7, 9; R.57, at 10.

The City's flawed justifications in this case illustrate precisely why the FAA must remain the authority for safety regulations. Allowing proprietors to enact safety regulations based on purely local considerations would confound the objectives of Congress in assigning sole responsibility for safety regulations to a Federal agency. Cf. Air Transp. Association of America v. Cuomo, 520 F.3d 218, 223-25 (2d Cir. 2008) (citing Rowe v. N.H. Motor Transp. Association, 442 U.S. 364, 373 (2008) (invalidating state law that required airlines to provide certain amenities to passengers during lengthy ground delays; although the court primarily relied on statute prohibiting regulation of air carrier routes, rates, or services, 49 U.S.C. § 41713, to the extent state law prescribed standards of safety, it was further found to be impliedly preempted by the Federal Aviation Act).

The City here argues that its regulation banning certain aircraft is based on *airport* safety, which is somehow distinct from the general field of *aviation* safety dedicated to FAA by Congress. See Pet. Br. at 20, 22. Such a distinction is illogical. As a general proposition, Courts have recognized Congressional intent to

17

centralize authority for aviation safety and thus preempt local regulation in a variety of safety areas. See Witty, 366 F.3d at 385 (finding that Congressionally enacted "pervasive regulatory scheme covering air safety concerns" included regulation of warnings and instructions that must be given to airline passengers); Air Transp. Association, 520 F.3d at 224 (noting that "Congress and the Federal Aviation Administration have used this authority to enact rules addressing virtually all areas of air safety").

The Second Circuit has expressly noted that FAA's Congressionally-delegated "'power to frame rules for the safe and efficient use of the nation's airspace' … extends to … airport runways." Id. at 224-25 (quoting Air Line Pilots Association, International v. Queseda, 276 F.2d 892, 894 (2d Cir. 1960); citing 14 C.F.R. § 139.392). See also Burbank-Glendale-Pasadena Airport Authority v. City of Los Angeles, 979 F.2d 1338, 1341 (9th Cir. 1992) (holding that non-proprietor's asserted police power to regulate runways and taxiways was preempted because "the proper placement of taxiways and runways is critical to the safety of takeoffs and landings and essential to the efficient management of the surrounding airspace").

Other Circuit Court decisions have refused to overturn safety determinations of FAA despite an airport owner's assertion that the lack of a restriction created a safety hazard. See Sandell v. FAA, 923 F.2d 661 (9th Cir. 1990); Menard v. FAA,

18

548 F.3d 353 (5th Cir. 2008) (both upholding FAA's safety determination allowing

operation of second airport or runway, contrary to arguments of nearby airfield or

runway owner that it could no longer operate safely.)  Furthermore, the Court in

<u>Sandell</u> noted that claiming sole rights to operating an *airport* in the area is a

monopoly of the *airspace*.   <u>See</u> 923 F.2d at 665 (rejecting argument against

opening nearby airport because "[o]ne does not have a right to monopolize the

navigable airspace if other people can safely use it").[7]  As made clear by the Courts

and intent of Congress, FAA has final authority to make safety determinations for

the safe and efficient use of airspace.

    The City in this case also posits that even if local regulation is preempted

either directly or via the Grant Assurances, it has the authority to regulate through

---

[7] <u>See also</u> <u>Bethman v. City of Ukiah</u>, 265 Cal. Rptr. 539, 546 (Cal. App. 1989) (noting distinction "between state or municipal action which effectively regulates the use of navigable airspace, aircraft traffic, or air flight safety, on the one hand, and state or municipal regulation of the location and environmental impacts of airports, the safety of ground maintenance facilities, and the manufacture of aircraft, on the other hand"); <u>Big Stone Broadcasting, Inc. v. Lindbloom</u>, 161 F.Supp.2d 1009, 1017 (D.S.D. 2001) (finding that FAA had sole jurisdiction over whether radio towers posed air safety hazard; "[t]he state, by its contrary conclusion, in essence, vetoed FAA's decision. ... This the state cannot do, especially in light of the fact that the basis for the state's decision ... had specifically been considered and studied by the FAA"); <u>Banner Advertising, Inc. v. City of Boulder</u>, 868 P.2d 1077, 1084 (Colo. 1994) (invalidating local ordinance which prohibited banner towing on safety grounds; "[t]he federal government's authority to regulate air safety is not an equal and concurrent power shared with the states or with local governments.").

the so-called proprietor's exception, and in so arguing, the City cites numerous cases all recognizing a proprietor's right to impose noise restrictions.  <u>See</u> Pet. Br. at 28-30.   The City ignores the important distinctions that many cases have specifically addressed a proprietor's exception for noise regulation and that Congress explicitly provided for enactment of noise regulations by airport proprietors in coordination with Federal objectives.  <u>See</u> 49 U.S.C. § 47521, <u>et seq.</u> Far from being "inherently implausible," as alleged by Santa Monica, it is perfectly logical that FAA would recognize a limited exception to allow proprietors to regulate purely local matters outside FAA's plenary authority over safety and efficiency, yet maintain exclusive authority to regulate matters of safety on a national basis.

As set forth above, aviation safety is a matter that must be consistent and uniformly regulated nationwide, taking into account the entire NPIAS.  This is especially true for regulations restricting access at airports that have accepted aid from Federal funds as set forth above.  FAA is in the best position to effectively evaluate and balance the efficiency of a regulation on the *national* system of aviation as a whole with the safety of aviation and individuals on the ground.  This case proves a point made by the Supreme Court more than a decade ago in <u>Northwest Airlines, Inc. v. County of Kent</u>, 510 U.S. 355 (1994):

> The Secretary of Transportation is charged with administering the federal aviation laws. … His Department is equipped, as courts are

20

not, to survey the field nationwide, and to regulate based on a full view of the relevant facts and circumstances.

Id. at 366-67.  See also Far East Conference v. U.S., 342 U.S. 570, 574 (1952) ("in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over"); Cablevision Systems Corp. v. FCC, 597 F.3d 1306, 1311 (D.C. Cir. 2010) ("we will not substitute our judgment for the agency's, especially when, as here, the decision under review requires expert policy judgment of a technical, complex, and dynamic subject").  AOPA and NBAA submit that the importance of this greater perspective is nowhere more true than in the area of the safety-based airport access restrictions presently at issue.

## III. Even If Municipalities Have Any Authority Over Aviation Safety, Santa Monica's Purported Safety Rationale Is Belied by its Actual Conduct; the City's Long-Standing Agenda Is to Restrict Access at SMO

As discussed above in footnote 2, the City has a history of attempting to restrict access at SMO.  Thus, even assuming, *arguendo*, that the City could enact a safety-based ordinance without FAA acquiescence, a further issue for this Court's analysis would be whether that *actually* has occurred, or if the current proposal is instead an extension of efforts to limit airport operations, merely cloaked in a veneer of safety.  As demonstrated in the record, FAA has established in this case that there is no actual safety issue at SMO, despite the City's attempts

21

to assert otherwise.  The FAA has nonetheless proposed alternatives that could be adopted and implemented, instead of an outright ban, to address the City's safety concerns.  Thus, the City's apparent underlying intent to control access to SMO to ensure that there are ultimately *no* operations at SMO may be relevant to this Court's review of whether there is truly a need by the City, contrary to FAA, to address the *safety* of operations at SMO.

Santa Monica makes much of the topography around the airport, which it asserts makes the establishment of RSAs "impracticable."  See Pet. Br., at 3.  But the City does not dispute that RSAs, as well as Runway Protection Zones ("RPZs") beyond the airport perimeter, *could* be established; it simply has *chosen* not to invest in acquiring neighboring property and other improvements.  See id. at 8-9.  Although Santa Monica asserts that doing so would be cost-prohibitive, see id., the City concedes that Federal funding is available for RSAs, see id. at 39, 43, as it also is for RPZs.  See FAA Br., at 9 ("FAA offered to fund airport improvements that would enhance safety without compromising operations"); FAD, at 12 (J.A. 1090); IDHO, at 34, 41 (J.A. 996, 1003).[8]  Thus, Federal dollars would enable the alleged safety concerns to be addressed without a ban, and at virtually no cost to the City.

---

[8] See generally 49 U.S.C. § 47101, et seq.; Airport Improvement Program Handbook, FAA Order 5100.38C.

But Santa Monica believes that its existing obligations to maintain SMO expire no later than 2015,[9] while new Federal AIP funds would incorporate Grant Assurances obligating the City to maintain the airport for at least 20 additional years.  See FAA Br., at 6.  Thus, Santa Monica may have declined to take the actions necessary to establish RSAs and RPZs with Federal grant monies in order to facilitate the airport's closure even though, by its own line of reasoning (with which Amici – and FAA – do not concur) its failure to do so in the meantime has endangered its own citizens' safety.

Moreover, the City concedes that it has discussed with FAA other measures that could be implemented, and largely be funded with AIP grants, that would provide immediate safety benefits.  The installation of EMAS beds at the ends of the SMO runway would reduce the risk of overruns for 97% of operations (including 90% of Category C and D aircraft).  See FAD, at 20-21 (J.A. 1098-99); FAA Br., at 20.  But Santa Monica flatly rejected FAA's proposal.  The City's objection appears to be that EMAS would not guarantee that *all* overruns would be

---

[9] The proceeding below included the issues of whether Santa Monica's Grant Assurances in fact do not expire until 2023, and whether SMO is subject to the Surplus Property Act of 1944 (ch. 479, 58 Stat. 765) and thus required to operate SMO as an airport in perpetuity.  See DD, at 55 (J.A. 110). Although these issues are noted by the parties (see Pet. Br. at 8, n.3; FAA Br. at 7, 13), they have not been fully briefed and are not necessary to the resolution of the case.  Accordingly, AOPA and NBAA urge the Court that any discussion of these issues be framed so as not to foreclose their full and fair review in the future.

23

prevented. <u>See</u> Pet. Br. at 53-54. This is illogical on its face; the City takes the position that implementing *no* safety measures is better than implementing ones that may be imperfect, but would mitigate the vast majority of its concerns.[10]

While safety is indisputably important, it is not a magic word, the mere invocation of which by the City overrides all other concerns, such as reasonable access, even assuming that safety regulation is within a municipality's jurisdiction. The City appears to take the position that any measures which fail to ensure 100% safety are unacceptable, and that if FAA cannot provide such a guarantee, the City is justified in nullifying Federal law. <u>See</u> FAA Br., at 10. But perfect safety is a chimera; safety can never be guaranteed. <u>See</u> <u>NRDC, Inc. v. EPA</u>, 824 F.2d 1146, 1153 (D.C. Cir. 1987) (use of the term "safety" in the Clean Air Act does not obligate FAA to ban all emissions of a pollutant in order to achieve "absolute certainty of safety"). As the Supreme Court has explained, "safe" does not mean "risk-free." <u>See</u> <u>AFL-CIO v. Am. Petroleum Inst.</u>, 448 U.S. 607, 642 (1980).

As FAA has noted, "[a]viation has inherent risks and the only way to reduce risk to zero would be to close airports completely." FAA Br., at 33. But that

---

[10] The City's Brief cites a 2001 accident as a justification for banning Category C and D aircraft. <u>See</u> <u>id.</u> at 9. But that accident involved a Category *B* aircraft. It is a rather cynical gambit to tout the deaths of a pilot and passenger in support of a measure that would have done nothing to improve their odds of survival, while counting down the clock to a date at which the City thinks that it can simply shut down the airport, and in the interim refuses to implement other measures.

would clearly be an abuse of government power.  SMO may not have been specifically designed to service Category C and D aircraft,[11] but FAA has found that aircraft can be safely operated at the airport with no special safety risks.  See FAD, at 12, 18 (J.A. 1090, 1096).  Allowing Santa Monica, and all localities that maintain airports, to substitute a demand for 100% safety, a goal that is patently impossible, over FAA's expert analysis would do nothing less than dismember the national air transportation system.  Accordingly, even if this Court were to hold that the City has any authority to regulate aviation safety, that finding should incorporate a high threshold for Santa Monica (and other municipalities) to actually exercise such authority, and a specific finding that in this case Santa Monica has failed to meet that bar, given evidence that the ordinance at issue was

---

[11] The City describes SMO as "small" and "old."  See Pet. Br., at 4.  In fact, the airport was designed to support significant operations: "The very strong pavement is the result of the runway reconstruction conducted by the Federal Government after World War II in order to accommodate large four-engine transport category transport aircraft weighing over 150,000 lbs."  See DD, at 3 n.4 (J.A. 58).  These aircraft "operated at approach speeds that equaled and in many cases exceeded those of jets."  Id. at 42.  Moreover, SMO's age is a red herring; most major airports in the U.S. have long pedigrees because localities have sought to close existing airports and prevent the construction of new ones.  Until a new airport opened in Panama City, Florida last month, only one major commercial service airport in the U.S. was less than 35 years old.  AOPA and NBAA members fly to many airports not served by air carriers – a key purpose of "reliever" airports such as SMO, see FAA Br. at 5-6.  Far more general aviation airports close than are opened, and commercial service airports such as LAX are overburdened and not able to accommodate any spill, as was recognized in the 1984 Settlement Agreement.  See § 2.b.i. (J.A. 171).

enacted not in the interests of protecting its citizens but in nakedly restricting operations at the airport.[12]

## Conclusion

The City's petition for review should be denied, and the decision of FAA, entered on July 8, 2009 and modified on September 3, 2009, should be upheld.

---

[12] If operations are restricted at SMO, traffic will not disappear but shift to other airports in the Los Angeles basin.  Thus, any real problems at SMO (which Amici and FAA dispute exist), would not be solved but relocated to SMO's neighbors – at least, until those other airports adopted similar restrictions and the national air transportation system became impassable.  See IDHO, at 42 (J.A. 1004) (Hawthorne, California, which the City asserts is a viable alternative, presents similar overrun issues).  FAA recently found that a proposal to restrict access to Bob Hope Airport in Burbank pursuant to 14 C.F.R. Part 161 was inadequate because it failed to establish that the safe and efficient use of navigable airspace would be maintained.  The analysis "understimate[d] the potential impact on other southern California airports. … The southern California airspace is currently congested and complex."  Final Decision on Proposed Airport Access Restriction, at 31 (FDMS Docket No. FAA-2009-0546) (October 31, 2009); notice published at 74 Fed. Reg. 66397 (Dec. 15, 2009).  While the basis of the City's proposal is different, the effects would be much the same; contrary to the City's assertions, see Pet. Br. at 34, displaced operations could *not* be easily accommodated by other Los Angeles basin airports.

Respectfully submitted,

LAW OFFICES OF YODICE                  ZUCKERT, SCOUTT &
ASSOCIATES.                            RASENBERGER, LLP


/s/ Kathleen A. Yodice, Esq.__        /s/ Frank J. Costello, Esq.___
Kathleen A. Yodice, Esq.              Frank J. Costello, Esq.
Elizabeth M. Candelario, Esq.         Jol A. Silversmith, Esq.
601 Pennsylvania Avenue, N.W.         888 Seventeenth Street, N.W.
Suite 875, South Building             Suite 700
Washington, DC 20004                  Washington, DC 20006
(202) 737-3030                        (202) 298-8660

*Counsel for AOPA*                    *Counsel for NBAA*

Dated: June 28, 2010

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the typeface requirements and type-volume limitations of Federal Rule of Appellate Procedure 29(c) and Circuit Rule 32 because this brief contains 6,999 words, excluding the parts of the brief exempted, and because it has been prepared in a proportionally spaced typeface (Times New Roman 14) using the Microsoft Word 2007 word processing program.

/s/ Kathleen A. Yodice, Esq.____
Kathleen A. Yodice, Esq.

## Certificate of Service

I hereby certify that on this 28th of June, 2010, I have served a copy of the foregoing on the following persons:

**Petitioner:**

W. Eric Pilsk
Thomas Devine
Kaplan Kirsch & Rockwell LLP
1001 Connecticut Ave., NW, Suite 800
Washington, DC 20036
epilsk@kaplankirsch.com
tdevine@kaplankirsch.com

Marsha Jones Moutrie
Lance S. Gams
Ivan O. Campbell
Santa Monica City Attorney's Office
1685 Main Street, Suite 310
Santa Monica, CA 90401
marsha.moutrie@smgov.net
lance.gams@smgov.net
ivan.campbell@smgov.net

**Respondent:**

Tony West
Mark B. Stern
Alisa B. Kelin
Dana Kaersvang

U.S. Department of Justice
Civil Division, Appellate Staff
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
tony.west@usdoj.gov
alisa.klein@usdoj.gov
mark.stern@usdoj.gov
dana.l.kaersvang@usdoj.gov

Robert S. Rivkin
Paul M. Geier
Paul Samuel Smith
U.S. Department of Transportation
Washington, DC 20590
robert.rivkin@dot.gov
paul.geier@dot.gov
paul.smith@dot.gov

Daphne A. Fuller
Jonathan W. Cross
Elizabeth J. Weir
Federal Aviation Administration
Washington, DC 20591
daphne.fuller@faa.gov
jonathan.cross@faa.gov
beth.weir@faa.gov

/s/ Kathleen A. Yodice, Esq.
Kathleen A. Yodice, Esq.

**ADDENDUM**

## <u>Index to Addendum</u>

### <u>Statutes</u>

49 U.S.C. § 40103 .................................................................... 1

49 U.S.C. § 47101 .................................................................... 3

49 U.S.C. § 47103 .................................................................... 6

49 U.S.C. § 47107 .................................................................... 8

United States Code Annotated
  Title 49. Transportation
    Subtitle VII. Aviation Programs
      Part A. Air Commerce and Safety
        Subpart I. General
          Chapter 401. General Provisions
            **§ 40103. Sovereignty and use of airspace**

**(a) Sovereignty and public right of transit.--(1)** The United States Government has exclusive sovereignty of airspace of the United States.

**(2)** A citizen of the United States has a public right of transit through the navigable airspace. To further that right, the Secretary of Transportation shall consult with the Architectural and Transportation Barriers Compliance Board established under section 502 of the Rehabilitation Act of 1973 (29 U.S.C. 792) before prescribing a regulation or issuing an order or procedure that will have a significant impact on the accessibility of commercial airports or commercial air transportation for handicapped individuals.

**(b) Use of airspace.--(1)** The Administrator of the Federal Aviation Administration shall develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. The Administrator may modify or revoke an assignment when required in the public interest.

**(2)** The Administrator shall prescribe air traffic regulations on the flight of aircraft (including regulations on safe altitudes) for--

  **(A)** navigating, protecting, and identifying aircraft;

  **(B)** protecting individuals and property on the ground;

  **(C)** using the navigable airspace efficiently; and

  **(D)** preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

**(3)** To establish security provisions that will encourage and allow maximum use of the navigable airspace by civil aircraft consistent with national security, the Administrator, in consultation with the Secretary of Defense, shall--

  **(A)** establish areas in the airspace the Administrator decides are necessary in the interest of national defense; and

  **(B)** by regulation or order, restrict or prohibit flight of civil aircraft that the Administrator cannot identify, locate, and control with available facilities in those areas.

**(4)** Notwithstanding the military exception in section 553(a)(1) of title 5, subchapter II of chapter 5 of title 5 applies to a regulation prescribed under this subsection.

**(c) Foreign aircraft.--**A foreign aircraft, not part of the armed forces of a foreign country, may be navigated in the United States as provided in section 41703 of this title.

**(d) Aircraft of armed forces of foreign countries.--**Aircraft of the armed forces of a foreign country may be navigated in the United States only when authorized by the Secretary of State.

**(e) No exclusive rights at certain facilities.--**A person does not have an exclusive right to use an air navigation facility on which Government money has been expended. However, providing services at an airport by only one

1

fixed-based operator is not an exclusive right if--

**(1)** it is unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide the services; and

**(2)** allowing more than one fixed-based operator to provide the services requires a reduction in space leased under an agreement existing on September 3, 1982, between the operator and the airport.

CREDIT(S)

(Added Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1101.)

Current through P.L. 111-191 (excluding P.L. 111-148, 111-152, 111-159, and 111-173) approved 6-15-10

United States Code Annotated
    Title 49. Transportation
        Subtitle VII. Aviation Programs
            Part B. Airport Development and Noise
                Chapter 471. Airport Development
                    Subchapter I. Airport Improvement
                        **§ 47101. Policies**

**(a) General.**--It is the policy of the United States--

  **(1)** that the safe operation of the airport and airway system is the highest aviation priority;

  **(2)** that aviation facilities be constructed and operated to minimize current and projected noise impact on nearby communities;

  **(3)** to give special emphasis to developing reliever airports;

  **(4)** that appropriate provisions should be made to make the development and enhancement of cargo hub airports easier;

  **(5)** to encourage the development of intermodal connections on airport property between aeronautical and other transportation modes and systems to serve air transportation passengers and cargo efficiently and effectively and promote economic development;

  **(6)** that airport development projects under this subchapter provide for the protection and enhancement of natural resources and the quality of the environment of the United States;

  **(7)** that airport construction and improvement projects that increase the capacity of facilities to accommodate passenger and cargo traffic be undertaken to the maximum feasible extent so that safety and efficiency increase and delays decrease;

  **(8)** to ensure that nonaviation usage of the navigable airspace be accommodated but not allowed to decrease the safety and capacity of the airspace and airport system;

  **(9)** that artificial restrictions on airport capacity--

    **(A)** are not in the public interest;

    **(B)** should be imposed to alleviate air traffic delays only after other reasonably available and less burdensome alternatives have been tried; and

    **(C)** should not discriminate unjustly between categories and classes of aircraft;

  **(10)** that special emphasis should be placed on converting appropriate former military air bases to civil use and identifying and improving additional joint-use facilities;

  **(11)** that the airport improvement program should be administered to encourage projects that employ innovative technology (including integrated in-pavement lighting systems for runways and taxiways and other runway and taxiway incursion prevention devices), concepts, and approaches that will promote safety, capacity, and efficiency improvements in the construction of airports and in the air transportation system (including the development and use of innovative concrete and other materials in the construction of airport facilities to minimize initial laydown costs, minimize time out of service, and maximize lifecycle durability) and to encourage and solicit innovative technology proposals and activities in the expenditure of funding pursuant to this subchapter;

3

**(12)** that airport fees, rates, and charges must be reasonable and may only be used for purposes not prohibited by this subchapter; and

**(13)** that airports should be as self-sustaining as possible under the circumstances existing at each particular airport and in establishing new fees, rates, and charges, and generating revenues from all sources, airport owners and operators should not seek to create revenue surpluses that exceed the amounts to be used for airport system purposes and for other purposes for which airport revenues may be spent under section 47107(b)(1) of this title, including reasonable reserves and other funds to facilitate financing and cover contingencies.

**(b) National transportation policy.--(1)** It is a goal of the United States to develop a national intermodal transportation system that transports passengers and property in an efficient manner. The future economic direction of the United States depends on its ability to confront directly the enormous challenges of the global economy, declining productivity growth, energy vulnerability, air pollution, and the need to rebuild the infrastructure of the United States.

**(2)** United States leadership in the world economy, the expanding wealth of the United States, the competitiveness of the industry of the United States, the standard of living, and the quality of life are at stake.

**(3)** A national intermodal transportation system is a coordinated, flexible network of diverse but complementary forms of transportation that transports passengers and property in the most efficient manner. By reducing transportation costs, these intermodal systems will enhance the ability of the industry of the United States to compete in the global marketplace.

**(4)** All forms of transportation, including aviation and other transportation systems of the future, will be full partners in the effort to reduce energy consumption and air pollution while promoting economic development.

**(5)** An intermodal transportation system consists of transportation hubs that connect different forms of appropriate transportation and provides users with the most efficient means of transportation and with access to commercial centers, business locations, population centers, and the vast rural areas of the United States, as well as providing links to other forms of transportation and to intercity connections.

**(6)** Intermodality and flexibility are paramount issues in the process of developing an integrated system that will obtain the optimum yield of United States resources.

**(7)** The United States transportation infrastructure must be reshaped to provide the economic underpinnings for the United States to compete in the 21st century global economy. The United States can no longer rely on the sheer size of its economy to dominate international economic rivals and must recognize fully that its economy is no longer a separate entity but is part of the global marketplace. The future economic prosperity of the United States depends on its ability to compete in an international marketplace that is teeming with competitors but in which a full one-quarter of the economic activity of the United States takes place.

**(8)** The United States must make a national commitment to rebuild its infrastructure through development of a national intermodal transportation system. The United States must provide the foundation for its industries to improve productivity and their ability to compete in the global economy with a system that will transport passengers and property in an efficient manner.

**(c) Capacity expansion and noise abatement.--**It is in the public interest to recognize the effects of airport capacity expansion projects on aircraft noise. Efforts to increase capacity through any means can have an impact on surrounding communities. Noncompatible land uses around airports must be reduced and efforts to mitigate noise must be given a high priority.

**(d) Consistency with air commerce and safety policies.--**Each airport and airway program should be carried out

4

consistently with section 40101(a), (b), (d), and (f) of this title to foster competition, prevent unfair methods of competition in air transportation, maintain essential air transportation, and prevent unjust and discriminatory practices, including as the practices may be applied between categories and classes of aircraft.

**(e) Adequacy of navigation aids and airport facilities.**--This subchapter should be carried out to provide adequate navigation aids and airport facilities for places at which scheduled commercial air service is provided. The facilities provided may include--

  **(1)** reliever airports; and

  **(2)** heliports designated by the Secretary of Transportation to relieve congestion at commercial service airports by diverting aircraft passengers from fixed-wing aircraft to helicopter carriers.

**(f) Maximum use of safety facilities.**--This subchapter should be carried out consistently with a comprehensive airspace system plan, giving highest priority to commercial service airports, to maximize the use of safety facilities, including installing, operating, and maintaining, to the extent possible with available money and considering other safety needs--

  **(1)** electronic or visual vertical guidance on each runway;

  **(2)** grooving or friction treatment of each primary and secondary runway;

  **(3)** distance-to-go signs for each primary and secondary runway;

  **(4)** a precision approach system, a vertical visual guidance system, and a full approach light system for each primary runway;

  **(5)** a nonprecision instrument approach for each secondary runway;

  **(6)** runway end identifier lights on each runway that does not have an approach light system;

  **(7)** a surface movement radar system at each category III airport;

  **(8)** a taxiway lighting and sign system;

  **(9)** runway edge lighting and marking;

  **(10)** radar approach coverage for each airport terminal area; and

  **(11)** runway and taxiway incursion prevention devices, including integrated in-pavement lighting systems for runways and taxiways.

**(g) Intermodal planning.**--To carry out the policy of subsection (a)(5) of this section, the Secretary of Transportation shall take each of the following actions:

  **(1) Coordination in development of airport plans and programs.**--Cooperate with State and local officials in developing airport plans and programs that are based on overall transportation needs. The airport plans and programs shall be developed in coordination with other transportation planning and considering comprehensive long-range land-use plans and overall social, economic, environmental, system performance, and energy conservation objectives. The process of developing airport plans and programs shall be continuing, cooperative, and comprehensive to the degree appropriate to the complexity of the transportation problems.

**(2) Goals for airport master and system plans.**--Encourage airport sponsors and State and local officials to develop airport master plans and airport system plans that--

    **(A)** foster effective coordination between aviation planning and metropolitan planning;

    **(B)** include an evaluation of aviation needs within the context of multimodal planning; and

    **(C)** are integrated with metropolitan plans to ensure that airport development proposals include adequate consideration of land use and ground transportation access.

**(3) Representation of airport operators on MPO'S.**--Encourage metropolitan planning organizations, particularly in areas with populations greater than 200,000, to establish membership positions for airport operators.

**(h) Consultation.**--To carry out the policy of subsection (a)(6) of this section, the Secretary of Transportation shall consult with the Secretary of the Interior and the Administrator of the Environmental Protection Agency about any project included in a project grant application involving the location of an airport or runway, or a major runway extension, that may have a significant effect on--

    **(1)** natural resources, including fish and wildlife;

    **(2)** natural, scenic, and recreation assets;

    **(3)** water and air quality; or

    **(4)** another factor affecting the environment.

CREDIT(S)

(Added Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1246, and amended Pub.L. 103-305, Title I, §§ 104, 110, Aug. 23, 1994, 108 Stat. 1571, 1573; Pub.L. 103-429, § 6(62), Oct. 31, 1994, 108 Stat. 4385; Pub.L. 104-264, Title I, § 141, Oct. 9, 1996, 110 Stat. 3220; Pub.L. 106-181, Title I, §§ 121(a), (b), 137(a), Apr. 5, 2000, 114 Stat. 74, 85.)

2000 Acts. Amendment by Pub.L. 106-181 applicable only to fiscal years beginning after September 30, 1999, see section 3 of Pub.L. 106-181, set out as a note under section 106 of this title.

Current through P.L. 111-191 (excluding P.L. 111-148, 111-152, 111-159, and 111-173) approved 6-15-10

United States Code Annotated
  Title 49. Transportation
    Subtitle VII. Aviation Programs
      Part B. Airport Development and Noise
        Chapter 471. Airport Development
          Subchapter I. Airport Improvement
            **§ 47103. National plan of integrated airport systems**

**(a) General requirements and considerations.**--The Secretary of Transportation shall maintain the plan for developing public-use airports in the United States, named "the national plan of integrated airport systems". The plan shall include the kind and estimated cost of eligible airport development the Secretary of Transportation considers necessary to provide a safe, efficient, and integrated system of public-use airports adequate to anticipate and meet the needs of civil aeronautics, to meet the national defense requirements of the Secretary of Defense, and to meet identified needs of the United States Postal Service. Airport development included in the plan may not be limited to meeting the needs of any particular classes or categories of public-use airports. In maintaining the plan, the Secretary of Transportation shall consider the needs of each segment of civil aviation and the relationship of each airport to--

**(1)** the rest of the transportation system in the particular area;

**(2)** forecasted technological developments in aeronautics; and

**(3)** forecasted developments in other modes of intercity transportation.

**(b) Specific requirements.**--In maintaining the plan, the Secretary of Transportation shall--

**(1)** to the extent possible and as appropriate, consult with departments, agencies, and instrumentalities of the United States Government, with public agencies, and with the aviation community;

**(2)** consider tall structures that reduce safety or airport capacity; and

**(3)** make every reasonable effort to address the needs of air cargo operations, Short Takeoff and Landing/Very Short Takeoff and Landing aircraft operations, and rotary wing aircraft operations.

**(c) Availability of domestic military airports and airport facilities.**--To the extent possible, the Secretary of Defense shall make domestic military airports and airport facilities available for civil use. In advising the Secretary of Transportation under subsection (a) of this section, the Secretary of Defense shall indicate the extent to which domestic military airports and airport facilities are available for civil use.

**(d) Publication.**--The Secretary of Transportation shall publish the status of the plan every 2 years.

CREDIT(S)

(Added Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1251.)

Current through P.L. 111-191 (excluding P.L. 111-148, 111-152, 111-159, and 111-173) approved 6-15-10

United States Code Annotated
  Title 49. Transportation
    Subtitle VII. Aviation Programs
      Part B. Airport Development and Noise
        Chapter 471. Airport Development
          Subchapter I. Airport Improvement

### § 47107. Project grant application approval conditioned on assurances about airport operations

**(a) General written assurances.**--The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that--

**(1)** the airport will be available for public use on reasonable conditions and without unjust discrimination;

**(2)** air carriers making similar use of the airport will be subject to substantially comparable charges--

**(A)** for facilities directly and substantially related to providing air transportation; and

**(B)** regulations and conditions, except for differences based on reasonable classifications, such as between--

**(i)** tenants and nontenants; and

**(ii)** signatory and nonsignatory carriers;

**(3)** the airport operator will not withhold unreasonably the classification or status of tenant or signatory from an air carrier that assumes obligations substantially similar to those already imposed on air carriers of that classification or status;

**(4)** a person providing, or intending to provide, aeronautical services to the public will not be given an exclusive right to use the airport, with a right given to only one fixed-base operator to provide services at an airport deemed not to be an exclusive right if--

**(A)** the right would be unreasonably costly, burdensome, or impractical for more than one fixed-base operator to provide the services; and

**(B)** allowing more than one fixed-base operator to provide the services would require reducing the space leased under an existing agreement between the one fixed-base operator and the airport owner or operator;

**(5)** fixed-base operators similarly using the airport will be subject to the same charges;

**(6)** an air carrier using the airport may service itself or use any fixed-base operator allowed by the airport operator to service any carrier at the airport;

**(7)** the airport and facilities on or connected with the airport will be operated and maintained suitably, with consideration given to climatic and flood conditions;

**(8)** a proposal to close the airport temporarily for a nonaeronautical purpose must first be approved by the Secretary;

**(9)** appropriate action will be taken to ensure that terminal airspace required to protect instrument and visual operations to the airport (including operations at established minimum flight altitudes) will be cleared and protected by mitigating existing, and preventing future, airport hazards;

**(10)** appropriate action, including the adoption of zoning laws, has been or will be taken to the extent reasonable to restrict the use of land next to or near the airport to uses that are compatible with normal airport operations;

**(11)** each of the airport's facilities developed with financial assistance from the United States Government and each of the airport's facilities usable for the landing and taking off of aircraft always will be available without charge for use by Government aircraft in common with other aircraft, except that if the use is substantial, the Government may be charged a reasonable share, proportionate to the use, of the cost of operating and maintaining the facility used;

**(12)** the airport owner or operator will provide, without charge to the Government, property interests of the sponsor in land or water areas or buildings that the Secretary decides are desirable for, and that will be used for, constructing at Government expense, facilities for carrying out activities related to air traffic control or navigation;

**(13)** the airport owner or operator will maintain a schedule of charges for use of facilities and services at the airport--

    **(A)** that will make the airport as self-sustaining as possible under the circumstances existing at the airport, including volume of traffic and economy of collection; and

    **(B)** without including in the rate base used for the charges the Government's share of costs for any project for which a grant is made under this subchapter or was made under the Federal Airport Act or the Airport and Airway Development Act of 1970;

**(14)** the project accounts and records will be kept using a standard system of accounting that the Secretary, after consulting with appropriate public agencies, prescribes;

**(15)** the airport owner or operator will submit any annual or special airport financial and operations reports to the Secretary that the Secretary reasonably requests and make such reports available to the public;

**(16)** the airport owner or operator will maintain a current layout plan of the airport that meets the following requirements:

    **(A)** the plan will be in a form the Secretary prescribes;

    **(B)** the Secretary will approve the plan and any revision or modification before the plan, revision, or modification takes effect;

    **(C)** the owner or operator will not make or allow any alteration in the airport or any of its facilities if the alteration does not comply with the plan the Secretary approves, and the Secretary is of the opinion that the alteration may affect adversely the safety, utility, or efficiency of the airport; and

    **(D)** when an alteration in the airport or its facility is made that does not conform to the approved plan and that the Secretary decides adversely affects the safety, utility, or efficiency of any property on or off the airport that is owned, leased, or financed by the Government, the owner or operator, if requested by the Secretary, will--

        **(i)** eliminate the adverse effect in a way the Secretary approves; or

        **(ii)** bear all cost of relocating the property or its replacement to a site acceptable to the Secretary and of restoring the property or its replacement to the level of safety, utility, efficiency, and cost of operation that existed before the alteration was made;

**(17)** each contract and subcontract for program management, construction management, planning studies,

9

feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping, and related services will be awarded in the same way that a contract for architectural and engineering services is negotiated under chapter 11 of title 40 or an equivalent qualifications-based requirement prescribed for or by the sponsor;

**(18)** the airport and each airport record will be available for inspection by the Secretary on reasonable request, and a report of the airport budget will be available to the public at reasonable times and places;

**(19)** the airport owner or operator will submit to the Secretary and make available to the public an annual report listing in detail--

    **(A)** all amounts paid by the airport to any other unit of government and the purposes for which each such payment was made; and

    **(B)** all services and property provided to other units of government and the amount of compensation received for provision of each such service and property;

**(20)** the airport owner or operator will permit, to the maximum extent practicable, intercity buses or other modes of transportation to have access to the airport, but the sponsor does not have any obligation under this paragraph, or because of it, to fund special facilities for intercity bus service or for other modes of transportation; and

**(21)** if the airport owner or operator and a person who owns an aircraft agree that a hangar is to be constructed at the airport for the aircraft at the aircraft owner's expense, the airport owner or operator will grant to the aircraft owner for the hangar a long-term lease that is subject to such terms and conditions on the hangar as the airport owner or operator may impose.

**(b) Written assurances on use of revenue.--(1)** The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that local taxes on aviation fuel (except taxes in effect on December 30, 1987) and the revenues generated by a public airport will be expended for the capital or operating costs of--

    **(A)** the airport;

    **(B)** the local airport system; or

    **(C)** other local facilities owned or operated by the airport owner or operator and directly and substantially related to the air transportation of passengers or property.

**(2)** Paragraph (1) of this subsection does not apply if a provision enacted not later than September 2, 1982, in a law controlling financing by the airport owner or operator, or a covenant or assurance in a debt obligation issued not later than September 2, 1982, by the owner or operator, provides that the revenues, including local taxes on aviation fuel at public airports, from any of the facilities of the owner or operator, including the airport, be used to support not only the airport but also the general debt obligations or other facilities of the owner or operator.

**(3)** This subsection does not prevent the use of a State tax on aviation fuel to support a State aviation program or the use of airport revenue on or off the airport for a noise mitigation purpose.

**(c) Written assurances on acquiring land.--(1)** In this subsection, land is needed for an airport purpose (except a noise compatibility purpose) if--

    **(A)(i)** the land may be needed for an aeronautical purpose (including runway protection zone) or serves as noise buffer land; and

**(ii)** revenue from interim uses of the land contributes to the financial self-sufficiency of the airport; and

**(B)** for land purchased with a grant the owner or operator received not later than December 30, 1987, the Secretary of Transportation or the department, agency, or instrumentality of the Government that made the grant was notified by the owner or operator of the use of the land and did not object to the use and the land is still being used for that purpose.

**(2)** The Secretary of Transportation may approve an application under this subchapter for an airport development project grant only if the Secretary receives written assurances, satisfactory to the Secretary, that if an airport owner or operator has received or will receive a grant for acquiring land and--

**(A)** if the land was or will be acquired for a noise compatibility purpose--

**(i)** the owner or operator will dispose of the land at fair market value at the earliest practicable time after the land no longer is needed for a noise compatibility purpose;

**(ii)** the disposition will be subject to retaining or reserving an interest in the land necessary to ensure that the land will be used in a way that is compatible with noise levels associated with operating the airport; and

**(iii)** the part of the proceeds from disposing of the land that is proportional to the Government's share of the cost of acquiring the land will be paid to the Secretary for deposit in the Airport and Airway Trust Fund established under section 9502 of the Internal Revenue Code of 1986 (26 U.S.C. 9502) or, as the Secretary prescribes, reinvested in an approved noise compatibility project, including the purchase of nonresidential buildings or property in the vicinity of residential buildings or property previously purchased by the airport as part of a noise compatibility program; or

**(B)** if the land was or will be acquired for an airport purpose (except a noise compatibility purpose)--

**(i)** the owner or operator, when the land no longer is needed for an airport purpose, will dispose of the land at fair market value or make available to the Secretary an amount equal to the Government's proportional share of the fair market value;

**(ii)** the disposition will be subject to retaining or reserving an interest in the land necessary to ensure that the land will be used in a way that is compatible with noise levels associated with operating the airport; and

**(iii)** the part of the proceeds from disposing of the land that is proportional to the Government's share of the cost of acquiring the land will be reinvested, on application to the Secretary, in another eligible airport development project the Secretary approves under this subchapter or paid to the Secretary for deposit in the Fund if another eligible project does not exist.

**(3)** Proceeds referred to in paragraph (2)(A)(iii) and (B)(iii) of this subsection and deposited in the Airport and Airway Trust Fund are available as provided in subsection (f) of this section.

**(d) Assurances of continuation as public-use airport.**--The Secretary of Transportation may approve an application under this subchapter for an airport development project grant for a privately owned public-use airport only if the Secretary receives appropriate assurances that the airport will continue to function as a public-use airport during the economic life (that must be at least 10 years) of any facility at the airport that was developed with Government financial assistance under this subchapter.

**(e) Written assurances of opportunities for small business concerns.--(1)** The Secretary of Transportation may approve a project grant application under this subchapter for an airport development project only if the Secretary receives written assurances, satisfactory to the Secretary, that the airport owner or operator will take necessary action to ensure, to the maximum extent practicable, that at least 10 percent of all businesses at the airport selling

consumer products or providing consumer services to the public are small business concerns (as defined by regulations of the Secretary) owned and controlled by a socially and economically disadvantaged individual (as defined in section 47113(a) of this title) or qualified HUBZone small business concerns (as defined in section 3(p) of the Small Business Act).

**(2)** An airport owner or operator may meet the percentage goal of paragraph (1) of this subsection by including any business operated through a management contract or subcontract. The dollar amount of a management contract or subcontract with a disadvantaged business enterprise shall be added to the total participation by disadvantaged business enterprises in airport concessions and to the base from which the airport's percentage goal is calculated. The dollar amount of a management contract or subcontract with a non-disadvantaged business enterprise and the gross revenue of business activities to which the management contract or subcontract pertains may not be added to this base.

**(3)** Except as provided in paragraph (4) of this subsection, an airport owner or operator may meet the percentage goal of paragraph (1) of this subsection by including the purchase from disadvantaged business enterprises of goods and services used in businesses conducted at the airport, but the owner or operator and the businesses conducted at the airport shall make good faith efforts to explore all available options to achieve, to the maximum extent practicable, compliance with the goal through direct ownership arrangements, including joint ventures and franchises.

**(4)(A)** In complying with paragraph (1) of this subsection, an airport owner or operator shall include the revenues of car rental firms at the airport in the base from which the percentage goal in paragraph (1) is calculated.

**(B)** An airport owner or operator may require a car rental firm to meet a requirement under paragraph (1) of this subsection by purchasing or leasing goods or services from a disadvantaged business enterprise. If an owner or operator requires such a purchase or lease, a car rental firm shall be permitted to meet the requirement by including purchases or leases of vehicles from any vendor that qualifies as a small business concern owned and controlled by a socially and economically disadvantaged individual or as a qualified HUBZone small business concern (as defined in section 3(p) of the Small Business Act).

**(C)** This subsection does not require a car rental firm to change its corporate structure to provide for direct ownership arrangements to meet the requirements of this subsection.

**(5)** This subsection does not preempt--

  **(A)** a State or local law, regulation, or policy enacted by the governing body of an airport owner or operator; or

  **(B)** the authority of a State or local government or airport owner or operator to adopt or enforce a law, regulation, or policy related to disadvantaged business enterprises.

**(6)** An airport owner or operator may provide opportunities for a small business concern owned and controlled by a socially and economically disadvantaged individual or a qualified HUBZone small business concern (as defined in section 3(p) of the Small Business Act) to participate through direct contractual agreement with that concern.

**(7)** An air carrier that provides passenger or property-carrying services or another business that conducts aeronautical activities at an airport may not be included in the percentage goal of paragraph (1) of this subsection for participation of small business concerns at the airport.

**(8)** Not later than April 29, 1993, the Secretary of Transportation shall prescribe regulations to carry out this subsection.

**(f) Availability of amounts.**--An amount deposited in the Airport and Airway Trust Fund under--

12

**(1)** subsection (c)(2)(A)(iii) of this section is available to the Secretary of Transportation to make a grant for airport development or airport planning under section 47104 of this title;

**(2)** subsection (c)(2)(B)(iii) of this section is available to the Secretary--

    **(A)** to make a grant for a purpose described in section 47115(b) of this title; and

    **(B)** for use under section 47114(d)(2) of this title at another airport in the State in which the land was disposed of under subsection (c)(2)(B)(ii) of this section; and

**(3)** subsection (c)(2)(B)(iii) of this section is in addition to an amount made available to the Secretary under section 48103 of this title and not subject to apportionment under section 47114 of this title.

**(g) Ensuring compliance.--(1)** To ensure compliance with this section, the Secretary of Transportation--

    **(A)** shall prescribe requirements for sponsors that the Secretary considers necessary; and

    **(B)** may make a contract with a public agency.

**(2)** The Secretary of Transportation may approve an application for a project grant only if the Secretary is satisfied that the requirements prescribed under paragraph (1)(A) of this subsection have been or will be met.

**(h) Modifying assurances and requiring compliance with additional assurances.--**

    **(1) In general.**--Subject to paragraph (2), before modifying an assurance required of a person receiving a grant under this subchapter and in effect after December 29, 1987, or to require compliance with an additional assurance from the person, the Secretary of Transportation must--

        **(A)** publish notice of the proposed modification in the Federal Register; and

        **(B)** provide an opportunity for comment on the proposal.

    **(2) Public notice before waiver of aeronautical land-use assurance.**--Before modifying an assurance under subsection (c)(2)(B) that requires any property to be used for an aeronautical purpose, the Secretary must provide notice to the public not less than 30 days before making such modification.

**(i) Relief from obligation to provide free space.**--When a sponsor provides a property interest in a land or water area or a building that the Secretary of Transportation uses to construct a facility at Government expense, the Secretary may relieve the sponsor from an obligation in a contract made under this chapter, the Airport and Airway Development Act of 1970, or the Federal Airport Act to provide free space to the Government in an airport building, to the extent the Secretary finds that the free space no longer is needed to carry out activities related to air traffic control or navigation.

**(j) Use of revenue in Hawaii.--(1)** In this subsection--

    **(A)** "duty-free merchandise" and "duty-free sales enterprise" have the same meanings given those terms in section 555(b)(8) of the Tariff Act of 1930 (19 U.S.C. 1555(b)(8)).

    **(B)** "highway" and "Federal-aid system" have the same meanings given those terms in section 101(a) of title 23.

**(2)** Notwithstanding subsection (b)(1) of this section, Hawaii may use, for a project for construction or reconstruction of a highway on a Federal-aid system that is not more than 10 miles by road from an airport and that

will facilitate access to the airport, revenue from the sales at off-airport locations in Hawaii of duty-free merchandise under a contract between Hawaii and a duty-free sales enterprise. However, the revenue resulting during a Hawaiian fiscal year may be used only if the amount of the revenue, plus amounts Hawaii receives in the fiscal year from all other sources for costs Hawaii incurs for operating all airports it operates and for debt service related to capital projects for the airports (including interest and amortization of principal costs), is more than 150 percent of the projected costs for the fiscal year.

**(3)(A)** Revenue from sales referred to in paragraph (2) of this subsection in a Hawaiian fiscal year that Hawaii may use may not be more than the amount that is greater than 150 percent as determined under paragraph (2).

**(B)** The maximum amount of revenue Hawaii may use under paragraph (2) of this subsection is $250,000,000.

**(4)** If a fee imposed or collected for rent, landing, or service from an aircraft operator by an airport operated by Hawaii is increased during the period from May 4, 1990, through December 31, 1994, by more than the percentage change in the Consumer Price Index of All Urban Consumers for Honolulu, Hawaii, that the Secretary of Labor publishes during that period and if revenue derived from the fee increases because the fee increased, the amount under paragraph (3)(B) of this subsection shall be reduced by the amount of the projected revenue increase in the period less the part of the increase attributable to changes in the Index in the period.

**(5)** Hawaii shall determine costs, revenue, and projected revenue increases referred to in this subsection and shall submit the determinations to the Secretary of Transportation. A determination is approved unless the Secretary disapproves it not later than 30 days after it is submitted.

**(6)** Hawaii is not eligible for a grant under section 47115 of this title in a fiscal year in which Hawaii uses under paragraph (2) of this subsection revenue from sales referred to in paragraph (2). Hawaii shall repay amounts it receives in a fiscal year under a grant it is not eligible to receive because of this paragraph to the Secretary of Transportation for deposit in the discretionary fund established under section 47115.

**(7)(A)** This subsection applies only to revenue from sales referred to in paragraph (2) of this subsection from May 5, 1990, through December 30, 1994, and to amounts in the Airport Revenue Fund of Hawaii that are attributable to revenue before May 4, 1990, on sales referred to in paragraph (2).

**(B)** Revenue from sales referred to in paragraph (2) of this subsection from May 5, 1990, through December 30, 1994, may be used under paragraph (2) in any Hawaiian fiscal year, including a Hawaiian fiscal year beginning after December 31, 1994.

**(k) Annual summaries of financial reports.**--The Secretary shall provide to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives an annual summary of the reports submitted to the Secretary under subsection (a)(19) of this section and under section 111(b) of the Federal Aviation Administration Authorization Act of 1994.

**(l) Policies and procedures to ensure enforcement against illegal diversion of airport revenue.--**

**(1) In general.**--Not later than 90 days after August 23, 1994, the Secretary of Transportation shall establish policies and procedures that will assure the prompt and effective enforcement of subsections (a)(13) and (b) of this section and grant assurances made under such subsections. Such policies and procedures shall recognize the exemption provision in subsection (b)(2) of this section and shall respond to the information contained in the reports of the Inspector General of the Department of Transportation on airport revenue diversion and such other relevant information as the Secretary may by law consider.

**(2) Revenue diversion.**--Policies and procedures to be established pursuant to paragraph (1) of this subsection shall prohibit, at a minimum, the diversion of airport revenues (except as authorized under subsection (b) of this section) through--

**(A)** direct payments or indirect payments, other than payments reflecting the value of services and facilities provided to the airport;

**(B)** use of airport revenues for general economic development, marketing, and promotional activities unrelated to airports or airport systems;

**(C)** payments in lieu of taxes or other assessments that exceed the value of services provided; or

**(D)** payments to compensate nonsponsoring governmental bodies for lost tax revenues exceeding stated tax rates.

**(3) Efforts to be self-sustaining.**--With respect to subsection (a)(13) of this section, policies and procedures to be established pursuant to paragraph (1) of this subsection shall take into account, at a minimum, whether owners and operators of airports, when entering into new or revised agreements or otherwise establishing rates, charges, and fees, have undertaken reasonable efforts to make their particular airports as self-sustaining as possible under the circumstances existing at such airports.

**(4) Administrative safeguards.**--Policies and procedures to be established pursuant to paragraph (1) shall mandate internal controls, auditing requirements, and increased levels of Department of Transportation personnel sufficient to respond fully and promptly to complaints received regarding possible violations of subsections (a)(13) and (b) of this section and grant assurances made under such subsections and to alert the Secretary to such possible violations.

**(5) Statute of limitations.**--In addition to the statute of limitations specified in subsection (n)(7), with respect to project grants made under this chapter--

**(A)** any request by a sponsor or any other governmental entity to any airport for additional payments for services conducted off of the airport or for reimbursement for capital contributions or operating expenses shall be filed not later than 6 years after the date on which the expense is incurred; and

**(B)** any amount of airport funds that are used to make a payment or reimbursement as described in subparagraph (A) after the date specified in that subparagraph shall be considered to be an illegal diversion of airport revenues that is subject to subsection (n).

**(m) Audit certification.**--

**(1) In general.**--The Secretary of Transportation, acting through the Administrator of the Federal Aviation Administration, shall include a provision in the compliance supplement provisions to require a recipient of a project grant (or any other recipient of Federal financial assistance that is provided for an airport) to include as part of an annual audit conducted under sections 7501 through 7505 of title 31, a review concerning the funding activities with respect to an airport that is the subject of the project grant (or other Federal financial assistance) and the sponsors, owners, or operators (or other recipients) involved.

**(2) Content of review.**--A review conducted under paragraph (1) shall provide reasonable assurances that funds paid or transferred to sponsors are paid or transferred in a manner consistent with the applicable requirements of this chapter and any other applicable provision of law (including regulations promulgated by the Secretary or the Administrator).

**(n) Recovery of illegally diverted funds.**--

**(1) In general.**--Not later than 180 days after the issuance of an audit or any other report that identifies an illegal diversion of airport revenues (as determined under subsections (b) and (l) and section 47133), the Secretary,

15

acting through the Administrator, shall--

**(A)** review the audit or report;

**(B)** perform appropriate factfinding; and

**(C)** conduct a hearing and render a final determination concerning whether the illegal diversion of airport revenues asserted in the audit or report occurred.

**(2) Notification.**--Upon making such a finding, the Secretary, acting through the Administrator, shall provide written notification to the sponsor and the airport of--

**(A)** the finding; and

**(B)** the obligations of the sponsor to reimburse the airport involved under this paragraph.

**(3) Administrative action.**--The Secretary may withhold any amount from funds that would otherwise be made available to the sponsor, including funds that would otherwise be made available to a State, municipality, or political subdivision thereof (including any multimodal transportation agency or transit authority of which the sponsor is a member entity) as part of an apportionment or grant made available pursuant to this title, if the sponsor--

**(A)** receives notification that the sponsor is required to reimburse an airport; and

**(B)** has had an opportunity to reimburse the airport, but has failed to do so.

**(4) Civil action.**--If a sponsor fails to pay an amount specified under paragraph (3) during the 180-day period beginning on the date of notification and the Secretary is unable to withhold a sufficient amount under paragraph (3), the Secretary, acting through the Administrator, may initiate a civil action under which the sponsor shall be liable for civil penalty in an amount equal to the illegal diversion in question plus interest (as determined under subsection (o)).

**(5) Disposition of penalties.**--

**(A) Amounts withheld.**--The Secretary or the Administrator shall transfer any amounts withheld under paragraph (3) to the Airport and Airway Trust Fund.

**(B) Civil penalties.**--With respect to any amount collected by a court in a civil action under paragraph (4), the court shall cause to be transferred to the Airport and Airway Trust Fund any amount collected as a civil penalty under paragraph (4).

**(6) Reimbursement.**--The Secretary, acting through the Administrator, shall, as soon as practicable after any amount is collected from a sponsor under paragraph (4), cause to be transferred from the Airport and Airway Trust Fund to an airport affected by a diversion that is the subject of a civil action under paragraph (4), reimbursement in an amount equal to the amount that has been collected from the sponsor under paragraph (4) (including any amount of interest calculated under subsection (o)).

**(7) Statute of limitations.**--No person may bring an action for the recovery of funds illegally diverted in violation of this section (as determined under subsections (b) and (l)) or section 47133 after the date that is 6 years after the date on which the diversion occurred.

**(o) Interest.**--

16

**(1) In general.**--Except as provided in paragraph (2), the Secretary, acting through the Administrator, shall charge a minimum annual rate of interest on the amount of any illegal diversion of revenues referred to in subsection (n) in an amount equal to the average investment interest rate for tax and loan accounts of the Department of the Treasury (as determined by the Secretary of the Treasury) for the applicable calendar year, rounded to the nearest whole percentage point.

**(2) Adjustment of interest rates.**--If, with respect to a calendar quarter, the average investment interest rate for tax and loan accounts of the Department of the Treasury exceeds the average investment interest rate for the immediately preceding calendar quarter, rounded to the nearest whole percentage point, the Secretary of the Treasury may adjust the interest rate charged under this subsection in a manner that reflects that change.

**(3) Accrual.**--Interest assessed under subsection (n) shall accrue from the date of the actual illegal diversion of revenues referred to in subsection (n).

**(4) Determination of applicable rate.**--The applicable rate of interest charged under paragraph (1) shall--

**(A)** be the rate in effect on the date on which interest begins to accrue under paragraph (3); and

**(B)** remain at a rate fixed under subparagraph (A) during the duration of the indebtedness.

**(p) Payment by airport to sponsor.**--If, in the course of an audit or other review conducted under this section, the Secretary or the Administrator determines that an airport owes a sponsor funds as a result of activities conducted by the sponsor or expenditures by the sponsor for the benefit of the airport, interest on that amount shall be determined in the same manner as provided in paragraphs (1) through (4) of subsection (o), except that the amount of any interest assessed under this subsection shall be determined from the date on which the Secretary or the Administrator makes that determination.

**(q)** Notwithstanding any written assurances prescribed in subsections (a) through (p), a general aviation airport with more than 300,000 annual operations may be exempt from having to accept scheduled passenger air carrier service, provided that the following conditions are met:

**(1)** No scheduled passenger air carrier has provided service at the airport within 5 years prior to January 1, 2002.

**(2)** The airport is located within or underneath the Class B airspace of an airport that maintains an airport operating certificate pursuant to section 44706 of title 49.

**(3)** The certificated airport operating under section 44706 of title 49 does not contribute to significant passenger delays as defined by DOT/FAA in the "Airport Capacity Benchmark Report 2001".

**(r)** An airport that meets the conditions of subsections (q)(1) through (3) is not subject to section 47524 of title 49 with respect to a prohibition on all scheduled passenger service.

**(s) Competition disclosure requirement.**--

**(1) In general.**--The Secretary of Transportation may approve an application under this subchapter for an airport development project grant for a large hub airport or a medium hub airport only if the Secretary receives assurances that the airport sponsor will provide the information required by paragraph (2) at such time and in such form as the Secretary may require.

**(2) Competitive access.**--On February 1 and August 1 of each year, an airport that during the previous 6-month period has been unable to accommodate one or more requests by an air carrier for access to gates or other facilities at that airport in order to provide service to the airport or to expand service at the airport shall transmit a report to

17

the Secretary that--

    **(A)** describes the requests;

    **(B)** provides an explanation as to why the requests could not be accommodated; and

    **(C)** provides a time frame within which, if any, the airport will be able to accommodate the requests.

  **(3) Sunset provision.**--This subsection shall cease to be effective beginning July 4, 2010.

CREDIT(S)

(Added Pub.L. 103-272, § 1(e), July 5, 1994, 108 Stat. 1256, and amended Pub.L. 103-305, Title I, §§ 111(a), (c), 112(a), Aug. 23, 1994, 108 Stat. 1573, 1574; Pub.L. 104-264, Title I, § 143, Title VIII, § 805(a), (b)(2), Oct. 9, 1996, 110 Stat. 3221, 3271, 3274; Pub.L. 104-287, § 5(9), (80), Oct. 11, 1996, 110 Stat. 3389, 3397; Pub.L. 105-135, Title VI, § 604(h)(1), Dec. 2, 1997, 111 Stat. 2634; Pub.L. 106-181, Title I, § 125(a), Apr. 5, 2000, 114 Stat. 75; Pub.L. 107-217, § 3(n)(7), Aug. 21, 2002, 116 Stat. 1303; Pub.L. 108-7, Div. I, Title III, § 321(a), Feb. 20, 2003, 117 Stat. 411; Pub.L. 108-11, Title II, § 2702, Apr. 16, 2003, 117 Stat. 600; Pub.L. 108-176, Title I, §§ 144, 164, 165, Title IV, § 424, Dec. 12, 2003, 117 Stat. 2503, 2513, 2514, 2554; Pub.L. 110-330, § 5(e), Sept. 30, 2008, 122 Stat. 3718; Pub.L. 111-12, § 5(d), Mar. 30, 2009, 123 Stat. 1458; Pub.L. 111-69, § 5(e), Oct. 1, 2009, 123 Stat. 2055; Pub.L. 111-116, § 5(d), Dec. 16, 2009, 123 Stat. 3032; Pub.L. 111-153, § 5(d), Mar. 31, 2010, 124 Stat. 1085; Pub.L. 111-161, § 5(d), Apr. 30, 2010, 124 Stat. 1127.)

2010 Acts. Amendments by Pub.L. 111-161, § 5, shall take effect on May 1, 2010, see Pub.L. 111-161, § 5(j), set out as a note under 49 U.S.C.A. § 40117.

Amendments by Pub.L. 111-153, § 5, effective Apr. 1, 2010, see Pub.L. 111-153, § 5(j), set out as a note under 49 U.S.C.A. § 40117.

Current through P.L. 111-191 (excluding P.L. 111-148, 111-152, 111-159, and 111-173) approved 6-15-10